THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK MAGUIRE, Defendant-Appellant.

Fifth District    No. 5—00—0524

Opinion filed May 16, 2002.

Daniel M. Kirwan and John H. Gleason, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Ste-

phen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial in the circuit court of Madison County, Mark Maguire (defendant) was convicted of predatory criminal sexual assault of a child (720 ILCS 5/12—14.1(a)(1) (West 1998)). Thereafter, the trial court found defendant to be a habitual criminal pursuant to section 33B—1 of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/33B—1 (West 1998)) and sentenced defendant to life in prison. On appeal, defendant contends that (1) his conviction must be reversed because the State failed to prove that he was the person who committed the crime, (2) the trial court deprived him of his rights to compulsory process and due process by preventing him from compelling the testimony of the child victim at the reliability hearing, and (3) section 33B—1 of the Criminal Code, under which he was found to be a habitual criminal, violates a defendant's constitutional rights to due process and a trial by jury as set forth by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm.

## FACTS

The victim was four years old when she alleged that defendant molested her by placing his penis in her mouth. Defendant and his family lived in the same trailer park as the victim and her family. Prior to the trial, the State notified defendant that pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—10 (West 1998)), it intended to introduce statements allegedly made by the victim to Susan Redmon, Sergeant Larry Coles, Kris J., M.J., S.J., and Lieutenant Jack Stalcup. The trial court then set the matter for a reliability hearing to determine whether the hearsay testimony was sufficiently reliable. Defendant subpoenaed the victim to testify at the reliability hearing. The State moved to quash the subpoena. The trial court granted the State's motion to quash.

The six witnesses listed by the State in its notice of intention to admit hearsay statements testified at the reliability hearing. Sergeant Larry Coles testified that on July 25, 1999, he was dispatched to the home of Kris J., the victim's mother, where he spoke with both Kris and the victim. Sergeant Coles asked the victim to tell him what happens when she goes to defendant's house to play. The victim initially hesitated, but after being reassured by her mother, she told Coles that defendant pulls down his pants in the living room when his son, J.D., goes outside to play. Defendant then gets under some covers with the

victim and puts his "wiener" in her mouth. The victim said that this happened a lot. It occurs when Diane, defendant's wife, is at work.

Upon completing the interview with the victim, Sergeant Coles telephoned his supervisor, Lieutenant Stalcup. Stalcup told Coles to ask the victim and her mother to come to headquarters so he could speak to them. Stalcup and Coles then interviewed the victim together at the police station. The victim's mother was also present. Coles asked the victim to tell Lieutenant Stalcup what happens when she plays at defendant's house. The victim said that defendant tells his son, J.D., to go outside and play. She and defendant then lie on the couch under the covers. Defendant then pulls down his pants and puts his "wiener" in her mouth. Defendant tells her not to tell anyone. He also gives her candy and lets her play with his kittens afterwards. Sergeant Coles specifically asked the victim whether she saw defendant's underwear. The victim said that she did not because defendant does not wear underwear. The victim said she is afraid of defendant. The victim said that she keeps her clothes on under the covers and denied that defendant ever touched her anywhere else.

Lieutenant Stalcup observed Sergeant Coles interview the victim at police headquarters while the victim's mother was in the room. Stalcup reiterated Coles' testimony about the interview. Stalcup also testified that later that day he and Coles went to defendant's house and placed defendant under arrest. The next day, Stalcup interviewed M.J., one of the victim's brothers. M.J. told him that the week before defendant's arrest, defendant babysat for him, his two brothers, and the victim and spanked all of them because they were fighting. According to Stalcup, M.J. did not seem mad about being spanked. M.J. also told Stalcup that he had walked over to defendant's trailer looking for the victim. When he entered, he saw the victim's head pop out from underneath covers on the couch. Defendant was also on the couch.

Susan Redmon, a Department of Children and Family Services (DCFS) employee, went to the South Roxana police department at Lieutenant Stalcup's request for assistance with the instant case. Redmon met with the victim and her mother in a small room at police headquarters. Redmon stated that the mother was present but did not interfere with Redmon's interview of the victim. According to Redmon, the victim could distinguish her "fake" stuffed duck from her "real dog," could count, and knew her colors. Redmon testified that the victim used the words "butt" and "pee-pee" and "wiener" for the parts of anatomically correct dolls. Redmon recalled that without being specifically asked, the victim started talking about her neighbor J.D. and his father and mother. The victim told Redmon that defen-

dant did a bad thing to her. She said that defendant did something bad while J.D. was outside playing and defendant's wife, Diane, was at work. She said that she and defendant would be under the blankets on the couch and that defendant would have his pants down around his feet. The victim said she did not remove any of her clothes. The victim told Redmon that after they were under the covers, defendant would put his "wiener" in her mouth and that his "wiener" would go in and out of her mouth. The victim said that her brothers were outside, except on one occasion when her brother M.J. saw her with her head under the covers.

The victim told M.J. what defendant did to her. According to Redmon, the victim then said that M.J. "told on her" to her mother. Redmon specifically asked the victim about his underwear, and the victim replied that defendant does not wear underwear. The victim also said that sometimes when defendant put his "wiener" in her mouth it would make her cough. Redmon testified that the victim's concept of time was not good, but the victim did tell her that it was warm out when it occurred and that it happened more than once.

Kris J. testified that she lives with her boyfriend and four children, including the victim, in a trailer park. Her trailer and defendant's trailer are separated only by a vacant lot. Defendant's son, J.D., is approximately 1½ years older than the victim. The two children often played together, and the victim spent time at defendant's trailer. Defendant and his family got along well with the victim's family. On occasion, Kris saw the victim and defendant lying together underneath a blanket on defendant's couch. Kris's sons were not allowed in defendant's trailer. When Kris questioned defendant about this unequal treatment, defendant explained that he treated the victim differently because she was like his daughter that he never gets to see.

At the end of July 1999, Kris first learned of the alleged assault when one of the victim's brothers, age nine, informed her that the victim told him defendant "had stuck his wiener in [the victim's] mouth." Kris immediately approached her daughter and asked her whether the allegations made by her brother were true. The victim told Kris that it was true and that it had occurred more than once. Kris asked a friend for advice. The friend talked to the victim, and the victim told the same story about defendant. Kris then contacted the police.

Between the time Kris learned about the alleged assault and the time she called the police, defendant became aware that the victim made accusations against him. Defendant asked Kris whether he could speak with the victim. Kris allowed defendant to speak with the victim while Kris was present. Defendant asked the victim whether she told

anyone that he stuck his "wiener" in her mouth. The victim denied making such an allegation. Kris stated, "I could tell [the victim] was a little scared *** [b]y the look on her face." Kris described what defendant said then, while in the victim's presence: "[Defendant stated] that he didn't really need to have this kind of thing getting around, because if it did, if one word of this got out, that [sic] he would go back to prison." Sometime after the victim and Kris talked to defendant, Kris asked her daughter whether, when defendant pulled his pants down, he also pulled his underwear down, and the victim said, "No, mommy, he doesn't wear underwear."

The victim's brother M.J., age 12, testified that on one occasion, he saw defendant and the victim on defendant's couch underneath some blankets. According to M.J., the victim liked to play with defendant's son, but she did not like going over to defendant's house. M.J. said that the victim told him "that when she went over there, she had to suck [defendant's] wienie." M.J. did not immediately tell his mother what the victim told him. M.J. admitted that sometimes he got in trouble when he was playing at defendant's house. On cross-examination, defense counsel asked M.J. whether, a few days before defendant's arrest, defendant had paddled him, and M.J. responded: "Yeah. But he like tapped us. He tapped me."

The victim's brother S.J., age nine, also testified that he saw the victim and defendant under the covers on defendant's couch. According to S.J., the victim later told him "that once when she was laying [sic] under the covers, [defendant] told her to suck his private." S.J. said that the victim used the term "pee-pee" rather than "private." S.J. said that the victim had a "sad face" and was crying when she told him about the incident and that she had never made this type of allegation before. S.J. told his mother what the victim told him about defendant. S.J. further testified that defendant would occasionally babysit for him and his siblings and that sometimes he would get in trouble at defendant's house. Defendant paddled S.J. and his siblings while he was babysitting for them right before he went to jail.

After the State presented its witnesses, the prosecutor declared that the State would not be using Lieutenant Stalcup at the trial as a witness to the victim's hearsay statements. The trial court found that the time, contents, and circumstances of the victim's statements to S.J., M.J., Kris J., Susan Redmon, and Sergeant Coles were sufficiently reliable to allow those witnesses to testify at the trial about the victim's hearsay statements. The trial court noted defendant's continuing objection to the hearsay statements.

At the trial, Sergeant Coles, M.J., S.J., Kris J., and Susan Redmon testified consistently with their testimony at the reliability hearing.

The victim, age five at the time of the trial, testified that she had completed preschool and would be starting kindergarten. She identified J.D. as a boy who lived next door. She said that she liked to play with J.D. and that they played both inside and outside. She said that J.D.'s dad's name is Mark and his mom's name is Diane. She said that Mark told her to keep a secret and that, in exchange for her keeping the secret, Mark gave her gum and let her play with his kittens. She said that the secret happened when she and Mark were on the couch and Diane was at work. Using anatomically correct dolls, she testified that Mark would take off his clothes and put his penis in her mouth. The victim ultimately told her brothers the secret, and her brothers told her mother.

Lieutenant Stalcup, an investigator with the South Roxana police department who has special training to deal with sexual assaults, testified that he interviewed both the victim and defendant. He recalled that the victim was scared but did not have trouble relaying what had happened. He also stated that while the victim's mother was present during the interview, the mother did nothing that concerned him. As to the interview of defendant, he recalled that defendant was read his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), signed a waiver of his rights, and proceeded to talk to Stalcup. Stalcup told defendant he was being investigated due to sexual assault allegations made by the victim. Stalcup asked defendant for his version of events. Defendant said, "[T]he situation come [*sic*] up, and the mother called the little girl over, and I was supposed to have done something." Stalcup asked him what he was supposed to have done, and defendant replied that one of the victim's brother's said he stuck his "wienie" in the victim's mouth. Defendant said that when he was talking to the victim and her mother, the victim specifically denied that this happened. Stalcup asked defendant if there was ever an opportunity for this to occur and whether he was ever alone with the victim. According to Stalcup, defendant responded: "Just when she got a drink of water or lemonade. But my son, J.D., was always there." Stalcup asked defendant whether he had any gum or candy, and defendant told him he had some "Chiclets" gum that his wife's father gave her. Defendant admitted that he had been under the covers on the couch with the victim, but he said that J.D. was also under the covers with them each time. Defendant said he had no idea why someone would make up such allegations. Defendant volunteered that he babysat for the children and had recently "whipped their butts for fighting." He said he had permission from their mother to do so.

Stalcup also asked defendant whether he had any kittens, and de-

fendant stated that he did. Stalcup asked defendant whether he wore any underwear. According to Stalcup, defendant replied that when he went to work he wore underwear but that he did not wear any underwear around the house. Stalcup searched defendant's trailer and found gum under the couch and kittens in a bedroom. He also retrieved a brown and black blanket from the couch. The parties stipulated that if Kris J. was recalled, she would testify that the blanket retrieved by Stalcup was the blanket she had seen on defendant's couch near the time in question.

After the State finished presenting its evidence, defendant moved for a directed verdict, arguing that insufficient evidence had been presented to convict defendant beyond a reasonable doubt. The trial court denied defendant's motion. Defendant did not present any evidence. Ultimately, the jury returned a verdict of guilty.

At the sentencing, it was disclosed that defendant had seven prior felony convictions, including convictions for Class X felonies. For example, in January 1978 defendant was convicted of armed robbery and burglary. Defendant was sentenced to 4 1/2 years in the Department of Corrections on the armed robbery conviction and 1 to 3 years' imprisonment on the burglary. In June 1980 defendant was convicted of home invasion and rape and was sentenced to 15 years in the Department of Corrections. In October 1989 defendant was convicted of residential burglary and was sentenced to four years in the Department of Corrections. In 1995, defendant was convicted of one count of aggravated criminal sexual assault and one count of kidnaping against an adult female. A memo dated July 27, 1999, from a sex therapist with the Department of Corrections was also introduced. The memo stated, *inter alia*:

> "[Defendant's] progress in treatment has been minimal at best. Client has been resistant and has consistently tried to undermine the group therapy process with his hostile and passive[-]aggressive tendencies. He does not accept responsibilities [sic] for any of his offending behavior[ ] but[,] rather, views himself as a victim of circumstance.
> ***
> Given the fact that client is so criminally versatile[,] it is this therapist [sic] opinion that he be considered a high risk to re[ ]offend[,] both sexually and criminally. Recent allegations involving [the] new sex offense charge would seem to confirm this prediction. Client is not amenable to treatment and would better be [sic] served if placed in a more restrictive environment."

After hearing all the evidence, the trial court found that defendant qualified as a habitual criminal, and the court sentenced defendant to

life imprisonment pursuant to section 33B—1 of the Criminal Code (720 ILCS 5/33B—1 (West 1998)). Defendant now appeals.

## ANALYSIS

### I. Identification of Defendant

Defendant first contends that his conviction must be reversed because the State failed to prove that he is the person who committed the crime. Defendant insists that none of the witnesses identified him as the person who committed the crime. The State points out that defendant's identity was never at issue in this case and that defendant waived this issue by failing to raise it at the trial or in his posttrial motion. Additionally, the State asserts that the victim's mother identified defendant in open court.

■ Generally, both an objection at the trial and a written posttrial motion are required to preserve an error for review. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Because defendant failed to raise the issue complained of here, either at the trial or in his posttrial motion, the issue is waived. Even assuming, *arguendo*, that the issue was not waived, we find it to be without merit.

A review of the record supports the State's assertion that defendant's identity was never at issue in this case. The victim identified "Mark" as the person who sexually assaulted her. "Mark" lived next door to her and has a son named J.D. The victim's mother, Kris J., and the victim's siblings all testified about "Mark" and his family and about the fact that defendant was their neighbor. Furthermore, the record shows that Kris was specifically asked whether she saw defendant in the courtroom. Kris replied that she did and pointed out that defendant was "wearing a white shirt" and "[h]as a reddish[-] white beard." The prosecutor asked that the record reflect that Kris identified defendant. The trial court replied, "The witness is pointing to Mr. Maguire." Under these circumstances, we cannot agree with defendant that the State failed to meet its burden of proving that he was the person who committed the crime charged.

### II. Reliability Hearing

Defendant next contends that the trial court deprived him of his rights to compulsory process and due process by preventing him from compelling the testimony of the victim at the reliability hearing and that, in light of these constitutional deprivations, his conviction must be reversed and the cause remanded for a new reliability hearing and a new trial. Defendant insists that by quashing the subpoena for the victim, the trial court deprived him of a key method of testing the reliability and admissibility of the victim's hearsay statements. We disagree.

■ Section 115—10(a)(2) of the Code provides that for any prosecution of a sexual offense committed on a child under the age of 13, testimony of the child's out-of-court statements which describe any complaint of such an act or matter or detail pertaining to any act which is an element of the charged offense is admissible as an exception to the hearsay rule. 725 ILCS 5/115—10(a)(2) (West 1998). The admission of such testimony is subject to the requirements of section 115—10(b) of the Code, which provides:

> "(b) Such testimony shall only be admitted if:
>> (1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and
>> (2) The child *** either:
>>> (A) testifies at the proceeding; or
>>> (B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement[.]" 725 ILCS 5/115—10(b) (West 1998).

The hearsay exception found in section 115—10 of the Code was a legislative response to the difficulty associated with convicting a person accused of sexually assaulting a child. It is well accepted that at a trial a child witness, especially one who is extremely young, might lack the cognitive or language skills to effectively communicate about the abuse or might be impeded psychologically in his or her effort to do so. *People v. Bowen*, 183 Ill. 2d 103, 115, 699 N.E.2d 577, 584 (1998).

The requirement that the court find that the "time, content, and circumstances" of the statement provide sufficient safeguards of reliability has been held to secure compliance with the defendant's sixth amendment right to be confronted with the witnesses against him (U.S. Const., amend. VI). *People v. Rocha*, 191 Ill. App. 3d 529, 541, 547 N.E.2d 1335, 1343 (1989). However, the actual testimony of the child at the reliability hearing is not necessary to enable the judge to evaluate whether there were sufficient safeguards of reliability when the statements were made. *People v. Back*, 239 Ill. App. 3d 44, 54, 605 N.E.2d 689, 696 (1992). In *Back*, the trial court allowed certain witnesses to testify regarding statements made to each of them by the child victim in a sexual assault, even though the child victim did not testify at the reliability hearing. *Back*, 239 Ill. App. 3d at 51-52, 605 N.E.2d at 695. The *Back* court held that the term "proceeding," as used in section 115—10 of the Code, "refers to trial proceedings, not the reliability hearing." 239 Ill. App. 3d at 53, 605 N.E.2d at 696. This decision was based on the statute's direction that the focus of the reliability hearing be on the time, content, and circumstances surrounding the child victim's statements. The *Back* court specifically stated,

"The child's testimony at the reliability hearing is not necessary to enable the trial judge to evaluate whether there were sufficient safeguards of reliability when the statements were made." 239 Ill. App. 3d at 54, 605 N.E.2d at 696. We recently adopted and followed the reasoning of *Back. People v. Murphy*, 322 Ill. App. 3d 271, 752 N.E.2d 19 (2001); see also *People v. Wilson*, 246 Ill. App. 3d 311, 615 N.E.2d 1283 (1993) (following and adopting the reasoning in *Back*).

Notwithstanding these decisions, defendant insists that it was unfair to impair defendant's chosen method for testing the reliability of the out-of-court statements, which in this case was to call the child victim. Defendant insists that quashing the subpoena harmed his interests and lightened the State's load. However, upon a close examination, it is clear that defendant is not challenging the trial court's findings that the time, content, and circumstances of the victim's statements about the events in question ensure their reliability.

Section 115—10(b)(2)(A) of the Code refers to only one "proceeding" at which the child victim must testify. 725 ILCS 5/115—10(b)(2)(A) (West 1998). The logical argument is that the "proceeding" means the trial rather than the reliability hearing, because such an interpretation protects a defendant's confrontation rights at a trial. *Murphy*, 322 Ill. App. 3d at 280, 752 N.E.2d at 26-27. In making such a determination, the *Murphy* court relied on *People v. Bowen*, 183 Ill. 2d 103, 699 N.E.2d 577 (1998). In *Bowen*, the Illinois Supreme Court determined that the testimony of the child is essential at the trial, not at the reliability hearing, and the court specifically stated, "[U]nless a finding of unavailability is made, statements admitted under section 115—10 can never serve as substitutes for trial testimony, because section 115—10 makes the introduction of the statements expressly contingent upon the child's production for direct and cross-examination at trial." *Bowen*, 183 Ill. 2d at 114-15, 699 N.E.2d at 584. In the instant case, the victim testified at the trial.

██ In determining the reliability of the child victim's hearsay statement, relevant factors include the following: (1) the spontaneity and consistent repetition of the statement, (2) the mental state of the child victim giving the statement, (3) the use of terminology not expected in a child of comparable age, and (4) the lack of a motive to fabricate. *Bowen*, 183 Ill. 2d at 120, 699 N.E.2d at 586. In the instant case, the victim's first allegation occurred spontaneously when she told her brother that "Mark" told her to suck his "pee-pee." The language evoked by the victim in describing the assault was consistent with the language one would expect a young child to use. The victim's brother said that the victim was crying when she made this statement and that the victim had never made this type of allegation before. The

victim made essentially the same allegations to police and a DCFS caseworker each time she was asked to repeat what had occurred. When the mother questioned the victim about the alleged assault, the victim gave her virtually the same details she had given her brother.

Moreover, some of the victim's details about the alleged assault indicate that her statements were reliable. For example, when she was asked about defendant's underwear, the victim replied that defendant did not wear underwear. When questioned by the police, defendant admitted that he did not wear underwear around the house. The victim said that defendant gave her gum and let her play with his kittens after the assault occurred. When the police interviewed defendant at his home and searched his house, they found a container full of gum and a litter of kittens in a back bedroom.

The victim's mother recalled that her family got along well with defendant's family. The victim often played with defendant's son. The only evidence of any motive to fabricate was that defendant recently had disciplined the children while they were in his care. There is no question that the State presented sufficient evidence at the reliability hearing to show that the statements were reliable.

■ Because there is no statutory requirement that the child victim testify at the reliability hearing, we cannot say that the trial court abused its discretion in quashing the subpoena, especially in light of the fact that the victim testified at the trial and defense counsel was given the opportunity to thoroughly cross-examine the victim. Nevertheless, we are not insensitive to defendant's concerns. We caution trial courts in the future to make certain that a defendant has a reasonable opportunity to test the reliability of the hearsay statements in a reasonable manner. However, we find that remanding the instant cause for a new reliability hearing would serve no purpose. Defendant failed to show that the statements were unreliable. For all these reasons, we find that the trial court did not deprive defendant of his constitutional rights to compulsory process or due process when it prevented him from compelling the testimony of the child victim at the reliability hearing.

### III. *Apprendi* Concerns

Defendant's final contention on appeal is that the life sentence imposed by the trial court pursuant to section 33B—1 of the Criminal Code must be vacated because it was imposed in violation of the requirements set forth by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In *Apprendi*, the United States Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty

for a crime beyond the prescribed statutory maximum must be submitted to a jury[ ] and proved beyond a reasonable doubt." 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

■ In *People v. Pickens*, 323 Ill. App. 3d 429, 752 N.E.2d 1195 (2001), this court rejected the same arguments raised by defendant herein. We specifically stated, "Since the increase in the defendant's penalty beyond the sentencing range otherwise provided was based on prior convictions, it was constitutionally permissible for the trial judge to impose life imprisonment." *Pickens*, 323 Ill. App. 3d at 435, 752 N.E.2d at 1200. The holding and rationale in *Pickens* are equally applicable to the case at bar. As in *Pickens*, here, defendant's prior convictions are not an element of the crimes that he committed. Defendant's convictions are a part of his past, a criminal history obtained through proceedings that provided procedural safeguards. See *Pickens*, 323 Ill. App. 3d at 434, 752 N.E.2d at 1199. Because section 33B—1 of the Criminal Code requires punishment enhancement based upon the existence of prior convictions, it does not run afoul of *Apprendi*. *Pickens*, 323 Ill. App. 3d at 434, 752 N.E.2d at 1199. Accordingly, we reject defendant's contention that his sentence must be vacated. Considering defendant's criminal propensity, the life sentence imposed by the trial court is warranted.

For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

Affirmed.

KUEHN and CHAPMAN, Melissa, JJ., concur.