No. 2--04--1190

filed:
11/16/05
modified: 3/24/06

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03--CF--3405 |
| GLENN JOHNSON, | ) ) ) | Honorable George Bridges, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

**Modified Upon Denial of Rehearing**

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

On October 15, 2003, the defendant, Glenn Johnson, was charged by indictment with two counts of predatory criminal sexual assault of a child (720 ILCS 5/12--14.1 (West 2002)) and three counts of aggravated criminal sexual abuse (720 ILCS 5/12--16(c)(1)(i) (West 2002)). On September 10, 2004, following a bench trial, the defendant was found guilty of two counts of aggravated criminal sexual abuse, and not guilty of the other charges. On November 24, 2004, the trial court sentenced the defendant to four years' imprisonment. The defendant appeals from this order. On appeal, the defendant argues that (1) he was not proven guilty beyond a reasonable doubt; (2) he was denied the opportunity to confront his accuser to show bias, interest, and motive to testify falsely; and

(3) the hearsay testimony admitted pursuant to section 115--10 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115--10 (West 2002)) is inadmissible because the statute is unconstitutional; (4) section 115--10(b)(3) of the Code (725 ILCS 5/115--10(b)(3) (West 2002)) renders the hearsay testimony inadmissible; and (5) the hearsay testimony cannot possibly be considered reliable *within the meaning of section 115--10 of the Code 725 ILCS 5 115--10 West 2002*. We affirm.

According to count I of the indictment, the defendant committed predatory criminal sexual assault of a child when he performed an act of sexual penetration by knowingly placing his mouth on the sex organ of the victim, J.C., who was under 13 years of age when the act was committed. Count II of the indictment stated that the defendant committed predatory criminal sexual assault as in count I, but added that, as a respite worker through the Jewish Children's Bureau, the defendant held a position of trust with the victim. Count III of the indictment stated that the defendant committed the offense of aggravated criminal sexual abuse when he performed an act of sexual conduct by touching the sex organ of the victim, who was under the age of 13, for the purpose of sexual gratification. Count IV of the indictment alleged that the defendant committed the offense of aggravated criminal sexual abuse as in count III, but added that, as a respite worker through the Jewish Children's Bureau, the defendant held a position of trust with the victim. Count V of the indictment stated that the defendant committed the offense of aggravated criminal sexual abuse when the defendant, who held a position of trust with the victim as a respite worker through the Jewish Children's Bureau, performed an act of sexual conduct by licking the sex organ of the victim, who was under the age of 13, for the purpose of sexual gratification.

The victim was born on February 6, 1990. At the time the charged offenses allegedly occurred, the period between November 2002 and February 2003, the victim was 12 years old. The victim suffers from mental disabilities. He has mental, vision, speech, and language impairments. He has attended a school for the developmentally disabled since he was six years old. Based on his special needs, the victim's mother sought respite care from the Jewish Children's Bureau (JCB). A respite worker for the JCB is somebody who works with children with special needs. The victim's respite care began in January 2001.

In September 2002, the defendant sought employment with the JCB and was hired as a part-time respite worker on October 14, 2002. The defendant was assigned to the victim. A respite worker is to pick the child up at his residence and take the child to do recreational activities, such as going to the library, going to the movies, or playing sports. The defendant provided care to the victim on Wednesdays on eight occasions: November 18 and December 11, 2002; January 8, 15, and 22, 2003; and February 5, 12, and 26, 2003. In March 2003, the defendant resigned from the JCB.

Over the defendant's objection, out-of-court statements made by the victim were admitted at the defendant's bench trial pursuant to section 115--10 of the Code (725 ILCS 5/115--10 (West 2002)). At the section 115--10 hearing, Tony Jones testified via stipulation that he is a licensed mental health therapist and that testing conducted in 1999 revealed that the victim has a verbal IQ of 54, a performance IQ of 52, and a full scale IQ of 49. Jones indicated that the victim meets the statutory definition of moderately mentally retarded.

Andrew Mullin testified that he was assigned as a respite worker for the victim in April 2003. On September 3, 2003, while Mullin was providing respite care to the victim, the victim told Mullin that he wished his old respite worker, the defendant, was still his respite worker. Mullin asked why and the victim said that he and the defendant did fun things together. Mullin questioned the victim about the fun things. Eventually, the victim told Mullin that the defendant licked his asshole and that the defendant had bubbles in his ass. Mullin asked the victim how many times this occurred and the victim held up three fingers. Mullin testified that the victim never mentioned the defendant s hands going down the victim s pants. Mullin asked the victim where the incidents took place. The victim responded that at least one of the incidents happened in the defendant s car. The victim told Mullin that the defendant told him not to tell anyone.

On the way back to the victim s house, the victim asked Mullin if he was going to tell the victim s mother. Mullin said he had to tell the victim s mother. The victim got angry and told Mullin that the incidents never happened. Later, the victim told Mullin that the incidents had occurred and that the only reason he said that they had not occurred was that he did not want to get the defendant in trouble.

When they arrived at the victim s residence, Mullin spoke to the victim s mother. The victim told his mother, while pointing at his genital area, that the defendant licked him. Mullin explained that the victim had told him that the defendant licked his asshole. The victim s mother asked the victim to show her what his asshole is, and the victim pointed to his penis. The victim s mother asked the victim if he meant his penis, and the victim said yes. The victim also said that the defendant was pulling on the defendant s penis and that stuff came out. A week later, on September 10, 2003, while Mullin was driving with the victim, the victim, unsolicited, pointed down a road and said that he and the defendant had been involved in inappropriate behavior on that road. On cross-examination, Mullin acknowledged that the victim never used the word penis prior to the victim s mother asking the victim if by ass the victim meant penis.

Investigator John Anderson of the Lincolnshire police department testified that he began his investigation after being contacted by the Department of Children and Family Services DCFS . On September 8, 2003, he met the victim and the victim s mother at the Lake County Children s Advocacy Center. Investigator Anderson asked the victim if he knew the difference between the truth and a lie. The victim responded affirmatively. Investigator Anderson asked the victim if it was true that four people were in the room and one lady was in the room. The victim responded that the first statement was a lie because there were only three people in the room. However, the second was true because there was only one lady in the room.

Thereafter, Investigator Anderson asked the victim basic questions. The victim said that the defendant was his respite worker and that the defendant would take him to the movies, to restaurants, and to the library. The defendant had taken him to see a Harry Potter movie and had also taken him to a Chili s restaurant and an Applebee s restaurant. The victim also said that the defendant sometimes tickled him on the stomach. Investigator Anderson asked what the victim meant by that. The victim said the defendant touched me on my ass. Investigator Anderson asked the victim if he meant his penis. The victim affirmed that he meant his penis.

Investigator Anderson further testified that the victim was shown diagrams of the front and back of a naked boy and a naked adult male. The victim was able to identify the penis and the buttocks on the boy and the man. Upon further questioning the victim said that the defendant had touched the victim s penis with his fingers inside of the victim s underwear. The victim said that the defendant would unzip the victim s pants to put his hands inside of the victim s underwear. The victim said this was done in the defendant s vehicle.

The victim also told Investigator Anderson that in addition to tickling and touching his penis, the defendant had also licked his penis. Investigator Anderson asked where this had occurred. The victim said that they had driven to the parking lot of an office complex, and that the defendant had licked him there. The victim also said that on another occasion, when they were driving to the victim s Uncle John s house in Riverwoods,

they pulled off a few blocks from Uncle John s house to get some air, and the defendant had licked his penis there as well.

Investigator Anderson then asked the victim if the defendant had ever shown the victim the defendant s penis. The victim said that the defendant had shown him his penis in the defendant s car. The victim said the defendant was shaking his own penis up and down and stuff came out. The victim said he thought that something had come out of his penis also. The victim said the defendant showed his penis to the victim on two occasions and had licked the victim s penis three times. The victim was not specific with dates.

Thereafter, Investigator Anderson arranged to meet with the victim on September 15, 2003. The victim had indicated that perhaps he could remember where some of the incidents had taken place by driving around the area with Investigator Anderson. Investigator Anderson, the victim, and the victim s mother went on the drive. The victim directed them over several streets on the way to his Uncle John s house. The victim pointed to the place where the defendant and he had stopped for air, and where the defendant had abused him. Investigator Anderson asked the victim to direct them to the office complex. The victim was able to direct them there as well.

On cross-examination, Investigator Anderson testified that the victim had said that the defendant had licked his penis on the way to his Uncle John s house. However, the victim did not say specifically what happened in the office complex parking lot. Investigator Anderson also acknowledged that his September 15 report did not indicate that the defendant licked the victim s penis on the way to the victim s Uncle John s house. Rather, the report indicated that the victim said the defendant had pulled on the defendant s penis and showed the victim his penis.

Thereafter, the defendant requested that the hearing be continued so that he could call a Lake Forest police officer to testify concerning a February 2004 investigation into allegations that the victim sexually

molested other children in the summer of 2003. The defendant argued that due to the allegations against the victim, the victim decided to point the finger at the defendant. The defendant also argued that testimony concerning the investigation was relevant to show a motive to fabricate and to show the victim s knowledge about sex and things of that nature.

The trial court determined that the defendant had not tied the investigation to any of the relevant factors that the court is to consider in determining whether there are sufficient safeguards of reliability on any of the victim s hearsay statements. Such factors include the victim s use of terminology unexpected of a child of a similar age or the lack of motive to fabricate. Additionally, in the present case, while the victim s outcry was in September 2003, a report concerning the victim s alleged sexual molestation of other children was not made until February 2004. Furthermore, the trial court stated

You have not indicated that you wish to call anyone to point out the--you do not wish to call any of the victims of his alleged sexual assault to try and explain to the Court the timing, the fact that maybe he knew that this was coming down the pike and that s why he decided to lie or fabricate this story. Calling the officer to tell this Court that he was involved in an investigation, which is what you have asked this Court to do, does not seem to establish to this Court that there would be motive to fabricate.

As such, the trial court denied the defendant s request to continue the hearing to have the Lake Forest police officer testify about the investigation involving the victim s alleged sexual molestation of other children.

Following the section 115--10 hearing, the trial court determined that the time, content, and circumstances of the victim s out-of-court statements provided sufficient safeguards of reliability with respect to those statements. As such, the trial court ruled that the victim s out-of-court statements, given by Mullin and Investigator Anderson, were admissible at trial. In so ruling, the trial court relied on the victim s use of terminology unexpected of a child of a similar age and his consistent repetition of the statements.

On July 28, 2004, prior to commencement of the bench trial, the defense presented a motion in limine requesting to cross-examine the victim regarding the allegations against him that were the subject of the February 2004 investigation. In his motion, the defendant argued that the line of inquiry was relevant to establish bias or motive to testify falsely and to show knowledge of sexual terms that a child of the victim s age would not normally know. Additionally, the defendant indicated that it was relevant to show a situation where a person is getting into trouble and turns around and blames someone else. The defendant explained that in the summer of 2003 the victim was confronted by his mother about his sexually inappropriate conduct and was separated from the individuals upon whom he committed his conduct. Soon thereafter, in September 2003, the victim made the allegations against the defendant.

The State argued that the defendant was charged in this case before there was any investigation of the victim regarding the other conduct. The State asserted that since the victim did not know he was getting into trouble, it did not make sense that he would blame the defendant. The State also argued that it was beyond the victim s mental capacity to plan to get the defendant. Finally, the State argued that the other incidents allegedly occurred after the defendant abused the victim, but before the abuse was discovered, so there was no relevance.

The trial court expressed its concerns about the time between the point that the victim was confronted by his mother about the abuse conducted on the other boys and the point that the victim reported the allegations against the defendant. As such, the trial court granted the defense latitude to explore the link between the confrontation with the victim s mother and the subsequent charges against the defendant, as an illustration of bias. However, the trial court stated that the latitude did not extend to questions concerning the underlying conduct because such details had nothing to do with a motive to make up a story about the defendant. The trial court clearly stated that it was not interested in any type of admission from the victim concerning the other allegations of misconduct.

At trial, the victim testified that he is 14 years old and lives in Lincolnshire with his mom and brother. The defendant would come to his house on Wednesdays to pick him up and they would go to the bookstore, to the movies, and out to eat. The defendant also took the victim to his Uncle John s house. However, the victim did not know the town or city where his uncle s house was located. The victim testified that on the way to his uncle s house, the defendant would stop the car, unbutton or unzip his pants, pull down his underwear, and stick out his penis. The defendant would move his hand up and down on his penis and bubbles would come out. The defendant would then wipe the bubbles off with a napkin. The defendant would then do the same to the victim  unbutton his pants, pull down the victim s underwear, and squeeze the victim s penis. The victim saw bubbles come out of his penis. After that they went to the victim s uncle s house. However, the victim did not tell his uncle about the incident.

The victim further testified that a similar incident occurred when he and the defendant were in a parking lot. In the parking lot they would stop, and the defendant would unbutton the victim s pants and pull down his underwear. The defendant held the victim s penis. The defendant then took the victim home. The victim testified that he did not tell anybody because the defendant told him not to and because he  the victim  would have been in trouble. The victim first told Mullin about it and then told his mother.

After the victim told his mother, Investigator Anderson came to the victim s house to talk about it and show the victim some pictures. The victim identified an adult male diagram as a man. The victim identified the penis and had other names for that part of the man, namely  asshole, dick, and ass. The victim also identified the buttocks as the  butt.  However, the victim did not have other names for the buttocks. The victim acknowledged that after he told Mullin what had happened with the defendant, he later retracted his story by telling Mullin that it did not happen. However, the truth was that it did happen.

On cross-examination, the victim testified that after he met the defendant he saw him every Wednesday. The victim testified that he met with the defendant more than 50 times. The victim denied that he told Investigator Anderson that the defendant took him to an Applebee's, a Chili's, and a Harry Potter movie and he testified that the defendant never took him to these places. The victim also denied that the defendant ever took him to a grocery store. The victim said that he was unhappy when the defendant quit being his respite worker and that he was upset that the defendant did not say goodbye to him. The victim testified that he was not sure if what happened on the way to his uncle's house occurred before or after his birthday. The incident occurred in a parking lot but the victim did not know the location of the parking lot.

The victim's mother testified and verified that the defendant provided respite care on December 11, 2002. On that date, the defendant and the victim went to the grocery store, purchased a frozen pizza, and came back to her house to cook it. Additionally, February 3, 2003, was the day the victim was supposed to be dropped off at his Uncle John's house in Riverwoods. The defendant also appeared on the next regularly scheduled respite day, February 12, 2003. February 26, 2003, was the last day the defendant provided respite care. The victim's mother testified that she did not receive advance notice of the defendant's resignation from the JCB. She testified that she did not hear about the alleged sexual abuse of the victim until September 3, 2003.

Robin Soul testified that she is the respite coordinator for the JCB. She hired the defendant and was his supervisor. On February 26, 2003, the defendant provided respite care to the victim. On or about that same day, the defendant filled out a daily respite worker log and stated that he would not be able to make his next respite care appointment with the victim on March 5, 2003. On March 8, 2003, the defendant sent Soul an e-mail message informing her that he was resigning his position with the JCB and taking a job in real estate sales. Soul attempted to contact the defendant two or three times subsequent to the e-mail

but was unsuccessful. JCB policy provides that a terminating respite care worker say good-bye at a final visit, but the defendant did not do that.

Mullin's testimony at trial was substantially the same as at the section 115--10 hearing. Additionally, Mullin testified that the victim told Mullin that he loved the defendant and that he missed him. In response to questions concerning what the defendant had done to the victim's penis, Mullin responded that the victim said the defendant just put his hands down the victim's pants and that the victim said that the defendant licked it.

Investigator Anderson's testimony was substantially the same as his testimony at the section 115--10 hearing. On cross-examination Investigator Anderson testified that on September 15, 2003, when the victim directed Investigator Anderson to the location near his Uncle John's house, the victim did not say anything about what had occurred at that location. Investigator Anderson admitted, however, that he had testified at the section 115--10 hearing that the victim had said that the defendant had licked the victim's penis at that location. Investigator Anderson further admitted that the police report he prepared of his meeting with the victim on September 15, 2003, recited that the victim stated that it was at this location that the defendant showed the victim the defendant's penis and pulled on the defendant's penis. Investigator Anderson finally confirmed that the victim had stated that the place near his uncle's house was where the defendant had taken out his penis and showed the victim his penis.

Investigator Anderson also testified that in February 2004 he was involved in an interview at a residence in Lake Forest. The interview concerned incidents in which the victim in the present case was the offender. The incidents allegedly took place in the summer of 2003. At some point in late 2003, the victim was separated from the other individuals involved in the incidents. Finally, Investigator Anderson testified

that no one told him about any confrontation with the victim, concerning the incidents in the summer of 2003, prior to the investigation in February 2004.

The State rested, and the defendant s motion for a directed finding was denied.

The defendant testified, denying any sort of sexual contact with the victim. The defendant testified in detail to each of the eight respite care appointments he had with the victim. Timesheets, mileage and expense records, and credit card bills corroborated the defendant s testimony. On November 18, 2002, he took the victim to Subway for dinner. On December 11, 2002, the victim had a school project that required the purchase of groceries. The defendant took the victim to Dominick s and then returned to the victim s house, where they cooked a frozen pizza. On January 8, 2003, the defendant took the victim to see the movie Veggie Tales. On February 5, 2003, the defendant took the victim to see the movie Kangaroo Jack. The defendant took the victim bowling once, to the KFC buffet once, to Boston Market on three occasions, but never to Chili s. In his respite worker log for February 26, 2003, the defendant stated he would not be able to make the next appointment with the victim on March 5, 2003. On March 8, 2003, he sent an e-mail to Sowl advising her that he was resigning to work as a real estate sales associate at Coldwell Banker. During the course of his employment, he and Sowl corresponded primarily by e-mail.

Respite case reviews relative to the victim were admitted into evidence as business records. Every review of the victim stated that he is unable to distinguish the truth from lies, that he has mental impairments, and that he exhibits impulsive behavior and impaired judgment. Additionally, every review stated that the victim exhibits inappropriate sexual behaviors, has inappropriately touched several females, and does not understand the reasons why this type of behavior is inappropriate. The review dated September 25, 2002, stated that the victim had started to learn the rules of basketball but frequently made up his own rules. Additionally, that review and another review stated that the victim continued to struggle with the concept of time. The reviews dated

March 3, June 10, September 30, and December 11, 2003, stated that the victim needs prompts to respond to questions with facts rather than fictitious answers.

The victim's JCB mental health assessment, also admitted as a business record, confirmed all the reviews and likewise stated that the victim is unable to distinguish the truth from lies. The assessment further stated that the victim's cognitive abilities are impaired and his cognitive functioning is between ages five and seven. The assessment noted that the victim "is taunted by the other children at school because he will do anything they tell him to do," "knows the rules but tends not to follow them," "struggles with memory recall, can be manipulating, and has difficulty discriminating between his thoughts and his actions," "has scattered thoughts and flights of ideas and talks to himself, loses reality, and at times believes his pretend is real." The assessment also noted that the victim's feelings and expressions can be inaccurate because of his inability to correctly process, i.e., he could be sad but laughing.

At the close of the testimony, the trial court found the defendant guilty of aggravated criminal sexual abuse. The trial court stated that although the victim testified the best he could, he was unable to really explain the facts or give the number of times he had been to various places with the defendant. The trial court acknowledged that the victim's testimony contained some inaccuracies. Nonetheless, the trial court found the victim's testimony credible. Specifically, the trial court stated

The victim "described how the defendant in this case would pull out his penis, being the defendant's, and then subsequently pull out [the victim's] penis [that] there was movement done by the defendant which ultimately resulted in what [the victim] termed to be bubbles. And I thought that this victim was credible with respect to that.

However, the trial court stated that the victim did not establish that the defendant had licked the victim's penis. This came in evidence only by way of the testimony of Mullin and Investigator Anderson. The trial court stated

that Mullin s and Investigator Anderson s testimony revealed that there were a number of contradictions regarding what had actually occurred.

Accordingly, the trial court found that the State proved only the offenses outlined in counts III and IV of the indictment, aggravated criminal sexual abuse, which stated that the defendant touched the penis of the victim. The trial court found that the offenses outlined in counts I, II, and V, involving the licking of the victim s penis or the placing of the victim s penis in the defendant s mouth, were not proven beyond a reasonable doubt. The trial court subsequently sentenced the defendant to four years in prison. Thereafter, the defendant filed a timely notice of appeal.

The defendant s third contention on appeal is that he is entitled to a new trial due to the unconstitutionality of section 115--10 of the Code. The defendant relies on In re E.H., 355 Ill. App. 3d 564, 577 2005 , in which one panel of the Illinois Appellate Court, First District, relying on Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 2004 , determined that section 115--10 of the Code is unconstitutional. In Crawford, the Supreme Court held that testimonial forms of hearsay evidence are inadmissible absent a finding of unavailability and an opportunity to cross-examine the witnesses. Crawford, 541 U.S. at 53-54, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365-66. However, when the declarant appears for cross-examination at trial, the c onfrontation c lause places no constraints at all on the use of his prior testimonial statements. Crawford, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9. In other words, when a child sex abuse victim appears at trial and is subject to cross-examination, any prior statement of the victim being offered pursuant to section 115--10 of the Code is a nonevent. People v. Sharp, 355 Ill. App. 3d 786, 796 2005 .

Here, the victim testified at trial and was subject to cross-examination. As such, none of the statements admitted pursuant to section 115--10 were improper under *Crawford*. See *Sharp*, 355 Ill. App. 3d at 796. Accordingly, as to the constitutionality of section 115--10 in light of *Crawford*, we need not address that issue here because *Crawford* clearly does not apply to the facts of the instant case. See *People v. Nash*, 173 Ill. 2d 423, 432 (1996) (reviewing court should not reach constitutional issues if the case can be determined on other grounds). Moreover, although another district of the Illinois Appellate Court has found section 115--10 to be unconstitutional (*In re E.H.*, 355 Ill. App. 3d at 577), such a decision is not binding on this court. See *People v. Caban*, 318 Ill. App. 3d 1082, 1086 (2001) (a decision of the appellate court is not binding on other appellate districts).

The defendant's fourth contention on appeal is that he is entitled to a new trial because section 115--10(b)(3) renders the victim's hearsay statements, testified to by Mullin and Investigator Anderson, statutorily inadmissible. Section 115--10(a) of the Code provides for the admission of hearsay evidence in prosecutions for physical or sexual acts committed against children under the age of 13 or persons who are moderately mentally retarded. See 725 ILCS 5/115--10(a) (West 2002). However, section 115--10(b) requires

    "(b) Such testimony shall only be admitted if

        (1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

        (2) The child or moderately, severely, or profoundly mentally retarded person either

        (A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement; and

(3) In a case involving an offense perpetrated against a child under the age of 13, the out of court statement was made before the victim attained 13 years of age or within 3 months after the commission of the offense, whichever occurs later, but the statement may be admitted regardless of the age of the victim at the time of the proceeding." 725 ILCS 5/115--10(b) (West 2002).

The defendant argues that section 115--10(b)(3) precludes the admission of the victim's statements because the victim's statements fall outside the provision's time frame. Specifically, the statements at issue occurred after the victim attained 13 years of age and they were made 7 months after the commission of the offenses.

At the outset, we note that although the defendant raised this issue at trial, he failed to raise it again in a posttrial motion. In order to preserve an issue for appellate review, a posttrial motion preserving the issue is required. See People v. Enoch, 122 Ill. 2d 176, 186 (1988) (both a trial objection and a written posttrial motion raising an issue are necessary to preserve an issue for review). Ordinarily the failure to raise an issue in a posttrial motion results in waiver. Enoch, 122 Ill. 2d at 186. However, because the defendant's argument implicates substantial rights, it is reviewable under the plain error rule. See 134 Ill. 2d R. 615(a).

As such, the question before this court is one of statutory construction. The cardinal rule of statutory construction is that the court must ascertain and give effect to the intent of the legislature. In re Marriage of King, 208 Ill. 2d 332, 340 (2003). The legislature's intent can be determined by looking at the language of the statute and construing each section of the statute together as a whole. People v. Patterson, 308 Ill. App. 3d 943, 947 (1999). Moreover, the language of the statute should be given its

plain and ordinary meaning. *King*, 208 Ill. 2d at 340. When the language of the statute is unambiguous, the court may not depart from the language and read into the statute exceptions, limitations, or conditions. *Patterson*, 308 Ill. App. 3d at 948. In determining the legislature's intent, the court should consider, in addition to the statutory language, the reason for the law, the problems to be remedied, and the objects and purposes sought. *People v. Smith*, 345 Ill. App. 3d 179, 185 (2004). Because the construction of a statute is a question of law, we apply a de *novo* standard of review. *People v. Carter*, 213 Ill. 2d 295, 301 (2004).

Construing each section of the statute together as a whole, we find the plain language of section 115--10(b)(3) to be clear and unambiguous. Section 115--10(a) creates a hearsay exception for the victim of a sexual assault who is "a child under the age of 13" and also for those "persons" who are "moderately, severely, or profoundly mentally retarded." 725 ILCS 5/115--10(a) (West 2002). Throughout the statute the legislature makes a distinction between children under the age of 13 and persons who are moderately mentally retarded. For example, in section 115--10(c), the legislature indicates that it is for the trier of fact to determine the weight and credibility of the hearsay testimony. In making its determination, the fact finder shall consider *either* the age of the child *or* the intellectual capabilities of the moderately mentally retarded person. See 725 ILCS 5/115--10(c) (West 2002); see also 725 ILCS 5/115--10(b)(2) (West 2002) (hearsay testimony admitted only if child *or* moderately mentally retarded person testifies or, if unavailable, there is corroborative evidence). Furthermore, when referring both to children under the age of 13 and to moderately mentally retarded persons, the legislature chose to use the term "victim." See 725 ILCS 5/115--10(a)(1), (a)(2) (West 2002); see also Pub. Act 90--786, §10, eff. January 1, 1999 (in sections 115--10(a)(1) and 115--10(a)(2), substituted "the victim" for "such child or institutionalized severely or profoundly mentally retarded person" in three places).

˘17˘

The language in section 115--10(b)(3) clearly applies only to offenses perpetrated against a child under the age of 13. The legislature did not use the collective term "victim" and did not include language indicating that the section applied to persons who are moderately mentally retarded. Accordingly, the time constraints set forth in section 115--10(b)(3) apply to child victims under the age of 13 but do not apply to moderately mentally retarded victims, even if the moderately mentally retarded victim is under the age of 13.

The purpose of the statute also supports this interpretation. See Smith, 345 Ill. App. 3d at 185. As set forth by our supreme court in People v. Holloway, 177 Ill. 2d 1, 9-10 (1997):

"It appears that the legislature, in providing for the admission of evidence of outcry statements as exceptions to the hearsay rule in certain cases, was concerned with the ability of the victim to understand and articulate what happened during the incident ***. The importance of allowing hearsay testimony of an outcry, however, is not dictated by the age of the victim when the assault occurs. Instead, it is dictated by the victim's ability to adequately testify to the alleged incident."

In expanding the hearsay exception to mentally retarded persons, the General Assembly expressed its desire to rectify difficulties when the complainant has an impaired ability to testify. Holloway, 177 Ill. 2d at 10. A normal child, as he or she increases in age, would be expected to develop the intellectual ability to adequately testify. However, a child victim who is also mentally retarded may always suffer from an impaired ability to testify. As such, imposing the time limitation of section 115--10(b)(3) to mentally retarded victims under the age of 13 would defeat the purpose of including mentally retarded persons within the hearsay exception. The legislature could not have intended such an absurd result. See People v. Collins, 214 Ill. 2d 206, 215 (2005) (in construing a statute, the court presumes the legislature did not intend an absurd result).

In the present case, the parties stipulated to the testimony that the victim had a full scale IQ of 49 and that the victim met the statutory definition of a moderately mentally retarded person. See 725 ILCS 5/102--23 (West 2002) (a moderately mentally retarded person is defined as a person whose

intelligence quotient is between 41 and 55. Since section 115--10 b 3 does not apply to moderately mentally retarded victims, even if the moderately mentally retarded victim is under the age of 13, the defendant s argument that section 115--10 b 3 renders the hearsay statements at issue statutorily inadmissible is without merit.

In so ruling, we note the defendant argues that, for the purposes of the application of section 115--10 b 3 , the victim in this case is a victim under 13 years of age. The defendant argues that the victim cannot be considered moderately mentally retarded because the indictments for aggravated criminal sexual abuse alleged only that the victim was under 13 years of age. The indictments did not allege that the victim was moderately mentally retarded.

At the outset, we note that the defendant raises this argument for the first time on appeal. At the trial court level, the defendant argued only that the time limitation of section 115--10 b 3 applied to moderately mentally retarded victims under the age of 13. On appeal, the defendant, for the first time, insinuates that the indictments preclude consideration of the victim as moderately mentally retarded, for purposes of the statutory hearsay exception, because they specified only that the victim was under 13 years of age. Arguments raised for the first time on appeal are considered waived. See People v. Curry, 56 Ill. 2d 162, 170 1973 a litigant cannot raise an issue for the first time on appeal issues not raised below are considered waived . Absent waiver, however, we find this contention to be without merit.

We agree with the defendant that the instant case is clearly a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13. However, the victim was not only under the age of 13, but was also moderately mentally retarded. It was unnecessary, nonetheless, for the indictments to indicate that the victim was moderately mentally retarded. The defendant was charged with aggravated criminal sexual abuse under section 12--16 c 1 i of the Criminal Code of 1961, which states, in relevant part

c The accused commits aggravated criminal sexual abuse if

"[I] the accused was 17 years of age or over and [] commits an act of sexual conduct with a victim who was under 13 years of age when the act was committed []." 720 ILCS 5/12--16(c)(1)(i) (West 2002).

The United States Constitution and the Illinois Constitution afford criminal defendants the right to be informed of the "nature and cause" of the accusations against them. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8. Section 111--3 of the Code requires that a charging instrument set forth "the nature and elements of the offense charged." 725 ILCS 5/111--3(a)(3) (West 2002). In the present case, the fact that the victim was moderately mentally retarded need not have been included in the indictments because this fact is not an element of the offense.

However, in determining whether the statutory hearsay exception applied in this case, the fact that the victim is moderately mentally retarded became relevant. As noted above, the importance of allowing hearsay testimony of an outcry is dictated by the victim's ability to adequately testify to the alleged incident. Holloway, 177 Ill. 2d at 10. We acknowledge that if the victim were not moderately mentally retarded, the time constraint of section 115--10(b)(3) would apply because the out-of-court statements at issue were made after the victim attained 13 years of age and seven months after the commission of the offense. In the present case, however, despite the victim's advance in age, he still had an impaired ability to testify because he is moderately mentally retarded. This is specifically the type of situation that the statutory hearsay exception was intended to rectify. See Holloway, 177 Ill. 2d at 10.

The defendant's final contention on appeal is that the State failed to establish that the time, content, and circumstances of the hearsay statements at issue were reliable within the meaning of section 115--10 (725 ILCS 5/115--10 (West 2002)). Section 115--10(b) of the Code provides that certain evidence shall be admitted as an exception to the hearsay rule. 725 ILCS 5/115--10(b) (West 2002). One of the required conditions, however, is that the "court finds in a hearing conducted outside the presence of the jury

that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. 725 ILCS 5 115--10 b 1 West 2002 . The requirement that the court find that the time, content, and circumstances of the statement provide sufficient safeguards of reliability has been held to secure compliance with the defendant s sixth amendment right to be confronted with the witnesses against him U.S. Const., amend. VI . People v. Maguire, 329 Ill. App. 3d 1186, 1195 2002 .

When conducting a section 115--10 hearing, a trial court must evaluate the totality of the circumstances surrounding the making of the hearsay statements. People v. Simpkins, 297 Ill. App. 3d 668, 676 1998 . In determining the reliability of the victim s hearsay statement, relevant factors include the following 1 the spontaneity and consistent repetition of the statement 2 the mental state of the victim giving the statement 3 the use of terminology not expected of a child of comparable age and 4 the lack of a motive to fabricate. Maguire, 329 Ill. App. 3d at 1196. The State, as the proponent of out—of—court statements sought to be admitted pursuant to section 115--10 of the Code, bears the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation. People v. Zwart, 151 Ill. 2d 37, 45 1992 . Simpkins, 297 Ill. App. 3d at 676. Questions regarding the admissibility of evidence lie within the discretion of the trial court. Zwart, 151 Ill. 2d at 44. A reviewing court may overturn a trial court s determination only when the record clearly demonstrates that the trial court abused its discretion. Zwart, 151 Ill. 2d at 44.

In the present case, the trial court determined that the time, content, and circumstances of the victim s out—of—court statements provided sufficient safeguards of reliability. The trial court specifically pointed to the use of terminology unexpected of a child of a similar age and the consistent repetition of the statements. For example, in its June 2, 2004, written order, the trial court specifically referred to the following statements, made by the victim to either Mullin or Investigator Anderson, as reliable He had bubbles in his ass and He said that the defendant had touched his penis with his claws. The trial court s determination was not an abuse

˘21˘

of discretion.

When talking with Mullin and Investigator Anderson, the victim used the terms "licked his asshole," "bubbles in his ass," and "licked his penis." Additionally, the victim said the defendant was "shaking" his penis up and down and "stuff" came out. We agree with the trial court that such terminology is unexpected of a child of a similar age as far as it relates to matters of a sexual nature. However, such descriptive terms are those that a child would commonly use and support the conclusion that the content of the statements was reliable. See Simpkins, 297 Ill. App. 3d at 678 (out-of-court statements deemed reliable where victim referred to her vagina as her "private," a term indicative of a young girl not versed in the nomenclature of bodily organs); People v. Back, 239 Ill. App. 3d 44, 59 (1992) (same). Moreover, pursuant to Mullin's and Investigator Anderson's testimony, the victim's statements to Mullin and Investigator Anderson were consistent with each other. The victim indicated to both Mullin and Investigator Anderson that the defendant licked his penis, that this had occurred three times, and that at least one of the incidents occurred in the defendant's car. Additionally, the victim stated to both that the defendant was "shaking" his own penis up and down and "stuff" came out.

Furthermore, the circumstances under which the statements were made also tend to support their reliability. See Zwart, 151 Ill. 2d at 44. The statements were made spontaneously, rather than in response to leading questions. The victim voluntarily reported the abuse to Mullin. Mullin and Investigator Anderson did not question the victim in a suggestive manner or encourage the victim to accuse the defendant of sexual abuse. Finally, with respect to the timing of the victim's statements, we acknowledge the delay in the victim's reporting of the abuse. The abuse occurred in late 2002 and early 2003. The victim did not first report the abuse until September 3, 2003. However, as a general rule, delay in reporting abuse will not automatically render a victim's statements inadmissible under section 115--10 of the Code. See Zwart, 151 Ill. 2d at 46. As such, we cannot say that the trial court abused its discretion in concluding that the hearsay

statements at issue possessed sufficient  safeguards of reliability  as required by section 115--10 of the Code.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

O'MALLEY and CALLUM, JJ., concur.