No. 2-08-1169          Filed: 12-16-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--289 |
| FRANK D. ATHERTON, | ) ) | Honorable J. Todd Kennedy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

Following a jury trial, the defendant, Frank Atherton, was convicted of two counts of predatory criminal sexual assault of a child (720 ILCS 5/3--6(j), 12--14.1(a)(1) (West 2002)) and was sentenced to a total of 24 years' imprisonment. On appeal, the defendant argues that: (1) he was not convicted beyond a reasonable doubt of one of the counts of predatory criminal sexual assault; (2) the trial court failed to comply with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007) in questioning the prospective jurors during voir dire; (3) section 115--10 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115--10 (West 2002)) is unconstitutional; (4) the trial court erred in admitting evidence pertaining to the child-sexual-abuse-accommodation syndrome; (5) he was deprived of the effective assistance of counsel; (6) the trial court erred in refusing to instruct the jury with Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4th); (7) he was deprived of a fair trial due to the

cumulative effect of the errors; and (8) the trial court erred in ordering him to pay a Crime Stoppers fine. We affirm in part and vacate in part.

## I. Background

On October 14, 2005, the defendant was charged by indictment with one count of predatory criminal sexual assault of a child. The indictment alleged that the defendant, who was older than 17, placed his penis in the vagina of a girl, Ariana O., who was younger than 13. The State subsequently filed a second superseding bill of indictment. The indictment added a second count, alleging that the defendant's sex organ had made contact with Ariana's anus. The indictment alleged that all of the defendant's conduct at issue had occurred between September 8, 2002, and November 30, 2002.

On January 9, 2006, the State filed a motion to admit hearsay testimony pursuant to section 115--10 of the Code. The State sought to admit statements that Ariana had made to her stepmother, Jennifer O. On May 8, 2006, the trial court conducted a hearing on the State's motion. Jennifer O. testified that she is married to Eric O. He has three children: Nick (age nine); Ariana (age eight); and Rebecca (age five). Eric shares custody with the children's mother, Juliana. On July 28, 2005, Jennifer was talking to the children and they were telling her how mean "Frank" was. Nick told her that "Frank" put his "wiener" in Ariana. After Nick said this, Ariana started crying. Jennifer asked Ariana if Nick's statement was true, and Ariana said "yes." Jennifer asked Ariana where "Frank" had touched her, and Ariana pointed between her legs. Jennifer asked whether Ariana had been wearing underwear, and Ariana said "no."

Jennifer testified that a month earlier, Ariana and Nick had asked questions about sex, so she gave them a book entitled, "It's So Amazing." The book upset Ariana and she could not sleep. Ariana said an illustration in the book depicting a man and woman in bed was "icky." According to

Jennifer, Ariana told her, "There's something I need to tell you. I can't tell you." Jennifer asked Ariana if someone hurt her, but Ariana did not respond.

At the close of the hearing, the trial court ruled that the statements were admissible, as there were sufficient indicia of reliability. The trial court explained that the statements seemed to be "fairly spontaneous" and not "coached in any way."

On August 20, 2008, the defendant requested that the trial court conduct a Frye hearing as to whether the State could introduce testimony regarding the child-sexual-abuse-accommodation syndrome. The trial court denied the request.

Between October 20 and October 27, 2008, the trial court conducted a jury trial on the charges against the defendant. Ariana testified that she was 11 years old and lived with her older brother Nick, her younger sister Rebecca, and her mother, Julianna. She visited regularly with her father Eric, and his wife, Jennifer. When she was six or seven, "Frank" babysat her and her brother and sister in their apartment. She had known "Frank" for about a year, and she believed he probably babysat her in the summer because there was no school. She also remembered "Frank" as being over at her home for Christmas and later in the winter around Valentine's Day, but not around Easter. "Frank" came over every time her mother went to work at a pancake restaurant, more than 20 times. Occasionally, "Frank" brought his own children over when he babysat. Once, "Frank's" mother came over.

Ariana described "Frank" as always having his shirt off, wearing earrings, and having tattoos on his arms and on his stomach. She was not able to identify in court the defendant as "Frank."

Ariana testified that she did not like "Frank," because he was mean. "Frank" brought his kids with him when he babysat, and they messed up her room but he made her clean it up. She told her father and Jennifer that "Frank" hit Nick.

Ariana further testified that "Frank" took her into the computer room and touched her "private" with his "private." A "private" is what a boy or girl uses to urinate. She knew boys and girls had different "privates" because she bathed with her brother. In the computer room with "Frank," she pulled her pants and underwear partly off, but kept her shirt on. She lay on the blue carpeted floor on her stomach. "Frank" pulled his own pants down and did "pushups" over her. "Frank's" "private" touched her "private" on the inside and it hurt. There was no blood. When Ariana complained, Frank gave her chocolate. She identified a large chocolate bar as the type "Frank" gave her.

When initially asked if "Frank" touched her anywhere else besides her "private," Ariana replied, "No." However, when later asked if Frank's "private" touched her anywhere else while she was on her stomach, Ariana said, "It was kind of in my butt." She stated it was "inside." When asked how that felt, Ariana responded, "I didn't really feel anything." Ariana stated she poops with her butt and "[h]e didn't put it inside there. It went in there as it was like going into my private. He didn't put it in where I poop." She further stated, "He didn't put it exactly in where I poop" and she did not feel anything when he did that. She was questioned, "You said [Frank's private] didn't go inside that part, but did it touch that part at all?" Ariana answered, "Yeah."

On cross-examination, Ariana testified that she could not specifically recall when Frank's touching of her occurred, but she thought it probably happened when she was seven and in the summer. She could not remember what happened afterward or exactly when it would start. Ariana

thought it might have lasted for 10 minutes, but she was not certain. She testified that it happened every time Frank came over, and always in the same place and in the same manner. She stated that it happened around Christmas, and in late winter around Valentine's Day, as well as in summer. She did not know where her brother and sister were when it took place. She testified that "it was a really long time ago and [she] barely remember[ed] anything."

Ariana additionally testified that she did not tell her mother about what happened. She told her mother only that she did not like "Frank." "Frank" did not tell her not to tell anyone. Ariana told Nick about what had occurred, probably when she was seven. Nick told Jennifer and she got him a book about the birds and bees from the library so he could understand what happened. Ariana read the book and a picture of a guy and a girl in bed scared her. She was worried she was going to have a baby until she realized that it had been past five months. Jennifer told her that she had to talk about what had happened.

Ariana stated that she remembered talking with a woman who sat on the floor in a room with cameras. She did not know that the woman's name was Jackie Weber. She told Weber that "Frank" never wore a shirt, even in the winter. She did not tell Weber that "Frank" had earrings. She told Weber that "Frank" hit Nick and that he did not care about his kids. She initially stated that she never saw "Frank" hit Nick or her younger sister. However, she later testified that "Frank" hit Rebecca and that Rebecca had bruises at least twice. Ariana testified that she had not seen "Frank" since 2002.

Ariana also testified that her aunt moved in and took over babysitting duties from "Frank." Her aunt's boyfriend, Jason, also moved in. After Jason moved out, Carl moved in. Carl would babysit her occasionally. She also spent some time with the man who lived below her apartment, Lorenzo. She testified that Jason, Carl, and Lorenzo did not touch her the way that Frank had.

Nurse practitioner Patricia Brandon testified that she examined Ariana on August 7, 2005. Ariana had a healed injury to her hymen consistent with penetration by a penis. Ariana had no injury to her anus.

Julianna Lubus testified that she was Ariana's mother. She broke up with Ariana's father, Eric O., in late 2001 or early 2002. She was involved in custody, visitation, and child support disputes with Eric from 2002 until 2005. After she broke up with Eric, she began dating Jerome Matuszak until around Ariana's fifth birthday in September 2002. Matuszak never lived with her.

Julianna testified that the defendant babysat her children from late September 2002 until late November 2002. Juliana worked at Grandma's Restaurant and then at Bacchus Nibbles. She worked the late shift from 5 p.m. until 2 a.m. Juliana did not pay the defendant, but instead she would sometimes watch his children while he worked. She denied that there was anything other than a working relationship between her and the defendant. She acknowledged that the defendant wanted to marry her.

Julianna identified the defendant in court. He looked different at trial than when he babysat. He weighed more and had more facial hair. When he was babysitting, the defendant either was clean-shaven or just had a mustache. The defendant's hair was also different at trial from the buzz-cut he had while babysitting. When she first met the defendant, he had a mullet and a goatee and tattoos on his arms, hands, and chest.

The defendant stopped babysitting Julianna's children in 2002 after the Department of Children and Family Services (DCFS) investigated allegations he physically abused her children. Julianna never saw any bruising on Rebecca she felt was consistent with being beaten. After the allegations, Julianna questioned the children only about whether the defendant hit them. She testified

that she noticed changes in the children during that time. After the defendant stopped watching the children, Julianna's sister moved in and her sister's boyfriend, Jason Sturges, began spending a lot of time at the apartment.

Jennifer O. testified consistently with her testimony at the section 115--10 hearing.

Ann Young testified that she is a child welfare supervisor working for Lutheran Social Services, a private agency that deals with abused and neglected families. Young testified regarding child-sexual-abuse-accommodation syndrome (the syndrome). The syndrome is actually a pattern of five behavioral characteristics often observed in children who have been sexually abused. The characteristics are secrecy, helplessness, entrapment or accommodation, delayed or unconvincing disclosure, and retraction. Young stated that secrecy means the child keeps the abuse a secret and that it can be the result of an explicit or implied threat. Helplessness refers to an imbalance of power between the child and the authority figure who is abusing. Entrapment or accommodation means the child feels trapped by the abuse and learns ways to deal with it. Disclosure is usually delayed and given only in increments. The eventual disclosure may conflict with what actually happened due to the child's inability to recall detail. Retraction often happens after a child discloses and feels guilt, fear, or shame. Young acknowledged that some studies had called the syndrome into question; however, she believed it was generally accepted.

Young further testified that there did not need to be a trusting relationship between the child and the abuser for the syndrome to apply. The degree of the relationship between the abuser and the child's parent could affect when disclosure is made. Young stated that a babysitter-child relationship is consistent with cases where the syndrome appears.

Young additionally testified that Ariana's assertions that she was alone with the abuser and was afraid of him were consistent with the secrecy component of the syndrome. Young stated that if Ariana told her mother that the offender was mean, that would fall into the helplessness portion of the syndrome. The allegation that the acts happened more than once was consistent with the entrapment element of the syndrome. Ariana's delayed disclosure was also consistent with the syndrome. Young explained that the syndrome still applied even though Ariana did not make the disclosure herself, because the triggering event of the delayed disclosure could be accidental, spontaneous, or not related to anything. Young further stated that, pursuant to the syndrome, children have an inconsistent chronology of events because children have underdeveloped concepts of time and a limited ability to recall detail.

In explaining the syndrome's characteristic of intimidation, Young acknowledged that the psychiatrist who first set forth the syndrome in an article, Dr. Summit, did not mention examples of nonverbal intimidation. However, Young believed a bribe could be considered intimidation. Young further acknowledged that Dr. Summit's article did not discuss implied secrecy and gave examples only of explicit requests or demands. She believed other research studies had indicated that implied secrecy was good enough to meet the requirements for the syndrome. She had also learned of implied secrecy through her personal work with children.

Young further acknowledged that, in his article, Dr. Summit indicated that it had become a maxim among child sex abuse intervention counselors and investigators that children never fabricate the type of explicit sexual manipulation they divulge in complaints and interrogations. Thus, it is the belief of those in such advocacy positions that children never lie about these matters.

At the close of the State's case, the defendant moved for a directed verdict. Following the denial of that motion, the defendant presented the testimony of Dorothy Knipprath, Dr. Robert Meyer, and himself.

Dorothy Knipprath testified that she was the defendant's mother. She testified that once when she was visiting the defendant at Julianna's apartment, the defendant was doing pushups with his sons on his back when Ariana slid underneath him. The defendant fell on Ariana and Ariana said that she was hurt; however, nothing was broken. Knipprath believed the defendant and Julianna were dating, as she once was awakened by the defendant and Julianna having sexual relations.

Dr. Robert Meyer testified that he is a licensed clinical psychologist and an assistant professor at Northern Illinois University. He is familiar with the syndrome. He indicated that Dr. Summit, who originally proposed the syndrome, worked primarily with incestuous families. According to Dr. Meyer, Dr. Summit wrote a subsequent article in which he indicated the syndrome was not really a syndrome; rather, it was his opinion regarding children of incest who live in very rigid family systems with a lot of controlling behavior and the need for secrecy. In 1992, Dr. Summit wrote that the term "syndrome" is misleading; he explained that the syndrome he had written about was not a clinically diagnostic instrument and should not be used to determine whether a child had been sexually abused or to suggest a child is lying. Dr. Meyer testified Dr. Summit wrote that he intended the syndrome to be a guide in helping with treatment and that he never foresaw it being used in a court of law as a means of obtaining convictions. Dr Meyer stated that the syndrome is an opinion and was not developed based on scientific research, validity studies, or reliability studies.

According to Dr. Meyer, there were several flaws discovered in the syndrome theory. The syndrome was used in the wrong situations, given that it was developed for intact, incestuous, rigid

families where the perpetrator was either a father or a stepfather who lived within the family and continued to exert control over it. Further, the syndrome was inappropriately used where the perpetrator was not even a part of the family and there was no reason to believe the child would have any reason to accommodate because there was no control being exerted on the child. Dr. Meyer also testified that some people went so far as to opine that if a child did not demonstrate the syndrome, he or she was not telling the truth.

Dr. Meyer testified that the only characteristic of the syndrome that further research could validate was secrecy. That being, if children are left on their own and not questioned, they often delay reporting longer. Dr. Meyer testified the ideas of denial and recantation of testimony provide nothing in the way of reliable or valid information to the trier of fact in determining whether abuse actually occurred. He stated literature now suggests that abused children who disclose generally provide full disclosure and that only a small minority recant. He further stated that when a child is abused, generally her memory about what happened does not diminish, because it is a very traumatic event that is difficult to put out of the mind.

The defendant testified that he met Julianna in the summer of 2002 after she moved into his building. They developed a deep relationship that began while Julianna's children were staying with their father. During that time, he began watching Julianna's children. His own children were living with their mother, but when they visited him, Julianna let them stay in her apartment because she had extra beds. Julianna watched his children twice.

On one occasion near the first of October, while his mother and sons were visiting, the defendant played "dog pile," exercising and playing, with the children. Julianna was present and Ariana was hurt in the play.

The defendant testified that he punished the children by making them stand in a corner. The children cried and threatened to tell their parents. He never called Ariana into the computer room by herself. He never took his shirt off around Ariana. He did remove his clothes in Julianna's presence because they had a physical relationship.

The defendant denied engaging in sexual activity with Ariana. He denied threatening her or giving her large chocolate bars.

At the close of the trial, the jury convicted the defendant of two counts of predatory criminal sexual assault. The trial court sentenced the defendant to serve consecutive terms of 12 years' imprisonment. The defendant thereafter filed a timely notice of appeal.

## II. Sufficiency of the Evidence

The defendant's first contention on appeal is that he was not convicted beyond a reasonable doubt of touching Ariana's anus with his penis. The defendant argues that the only evidence that he made sexual contact with Ariana's anus was Ariana's contradictory testimony given in response to repeated questioning following her initial denial of contact anywhere other than her vagina.

It is not the province of this court to retry the defendant. People v. Collins, 106 Ill. 2d 237, 261 (1985). The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) Collins, 106 Ill. 2d at 261, quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). The sufficiency of the evidence and the relative weight and credibility to be given the testimony of the witnesses are considerations within the exclusive jurisdiction of the fact finder. People v. Jimerson, 166 Ill. 2d 211,

214 (1995). The evaluation of the testimony and the resolution of any conflicts or inconsistencies that may appear are also wholly within the province of the finder of fact. Collins, 106 Ill. 2d at 261-62.

To sustain a conviction of predatory criminal sexual assault of a child, the State must prove the defendant was 17 years of age or over and committed an act of sexual penetration with a victim who was under 13 years of age when the act was committed. 720 ILCS 5/12--14.1(a)(1) (West 2002). "Sexual" penetration means any contact, however slight, between the sex organ or anus of one person and the sex organ or anus of another person, or any intrusion, however slight, of any body part of one person into the sex organ or anus of another person. 720 ILCS 5/12--12(f) (West 2002). The State must prove "actual contact" between the defendant's sex organ and the sex organ or anus of the complainant. People v. Finley, 178 Ill. App. 3d 301, 307 (1988). Evidence that the defendant's sex organ only touched an area near the complainant's sex organ or anus is insufficient to establish the element of penetration. People v. Oliver, 38 Ill. App. 3d 166, 170 (1976).

Ariana testified that the defendant did "pushups" over her and that his "private" touched her "private" on the inside. Ariana explained that a "private" was what someone used to urinate. When asked if the defendant touched her anywhere besides her "private," Ariana responded that he had not. Upon further questioning if the defendant had touched her anywhere else, Ariana said "It was kind of in my butt." When encouraged to clarify if it was inside or outside, Ariana replied "inside." When asked how that felt, Ariana replied, "I didn't really feel anything." She stated she poops with her butt and "[h]e didn't put it inside there. It went in there as it was like going into my private. He didn't put it in where I poop." She repeated, "He didn't put it exactly in where I poop," and she clarified she did not feel anything when he did that. When again questioned, "You said [the defendant's private] didn't go inside that part, but did it touch that part at all?" Ariana responded, "Yes."

We agree with the defendant that Ariana's testimony at times was seemingly contradictory. However, it was ultimately for the jury to resolve any conflicts or inconsistencies in her testimony. See Collins, 106 Ill. 2d at 261-62. Ariana testified that the defendant's penis went into her anus as it was going into her vagina. This testimony was sufficient to convict the defendant of predatory criminal sexual assault of a child. See Collins, 106 Ill. 2d at 261.

In so ruling, we find unpersuasive the defendant's reliance on People v. Oliver, 38 Ill. App. 3d 166, 170 (1976). In that case, the complainant did not testify that the defendant's penis touched her anus. Oliver, 38 Ill. App. 3d at 170. Rather, she characterized the defendant's conduct by a reference to "in my butt." Oliver, 38 Ill. App. 3d at 170. She also made an out-of-court statement that the defendant's penis went along her "cheeks." Oliver, 38 Ill. App. 3d at 170. In reversing the defendant's conviction, the reviewing court explained that the State was required to show an act involving the sex organ of the defendant and the anus of the complainant. Oliver, 38 Ill. App. 3d at 170. The reviewing court found that the State did not meet its burden of proof, because the complainant's lone reference at trial that the defendant's penis was "in [her] butt" was insufficient to establish deviate sexual assault in light of her prior characterization that the defendant's penis had just gone along her "cheeks." Oliver, 38 Ill. App. 3d at 170.

Here, unlike the complainant in Oliver, Ariana did testify that the defendant's penis went inside her anus.

### III. Defendant's Right to a Fair Trial

### A. Trial Court's Compliance With Rule 431(b)

The defendant argues that the trial court failed to strictly comply with Rule 431(b) in that it did not question the prospective jurors whether they understood and accepted each of the

fundamental principles outlined in People v. Zehr, 103 Ill. 2d 472, 477 (1984). Further, the defendant contends that the trial court failed to ask any questions at all about one of the principles--that he had no obligation to present any evidence on his behalf.

Rule 431(b) provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

At the outset, we note that the defendant forfeited this issue because he neither objected at the time of voir dire nor raised this issue in his posttrial motion. Nonetheless, we may review a forfeited error under the plain-error rule if either the evidence is so closely balanced that the jury's verdict may have resulted from the error and not the evidence, or the error was so serious that the defendant was denied a substantial right and thus a fair trial. See People v. Herron, 215 Ill. 2d 167, 178-79 (2005). However, we must first determine whether an error occurred. People v. Blair, 395 Ill. App. 3d 465, 467 (2009).

As to the first, second, and fourth Zehr principles, the defendant contends that the trial court failed to adequately question the potential jurors to determine whether they understood and accepted those concepts. Rather, the trial court asked only whether they would "have any difficulty" with some of the propositions and whether, if given instructions on the propositions, they would be "willing to follow" others. The defendant insists that asking the potential jurors if they had "difficulties" with the propositions did not comply with Rule 431(b). We disagree.

Rule 431(b) does not require the trial court to recite the principles therein verbatim. People v. Chester, 396 Ill. App. 3d 1067, 1072 (2010). We believe asking the potential jurors whether they had any "difficulties" with the propositions was just another way of asking if they understood those propositions. Further, asking the potential jurors if they were "willing to follow" the propositions was just another way of asking the potential jurors if they accepted those propositions. Thus, the trial court's questions as to those principles complied with Rule 431(b). Chester, 396 Ill. App. 3d at 1072.

The defendant further argues that the trial court failed to question the potential jurors at all about the third principle, that he need not present evidence on his own behalf. However, the trial court did ask whether they would be willing to follow the instruction that "defendant does not have the burden of proving himself innocent." We believe that the trial court's question sufficiently conveyed that the defendant was not obligated to present any evidence on his behalf. See Chester, 396 Ill. App. 3d at 1072 ("The court's statement that 'defendant is not required to prove his innocence' would be interpreted by a reasonable jury to satisfy the third Rule 431(b) principle because if defendant is not required to prove his innocence, he has no reason to present evidence"). Consequently, no error occurred. Even if we were to find error, the defendant's right to a fair trial was not compromised, because the defendant did present evidence on his own behalf. See People

v. Rogers, No. 2--08--0889, slip op. at 13 (August 6, 2010); see also People v. Thompson, No. 109033, slip op. at 12 (October 21, 2010) ("We cannot presume the jury was biased simply because the trial court erred in conducting the Rule 431(b) questioning").

### B. Constitutionality of Section 115--10 in Light of Crawford v. Washington

We next address the defendant's argument that, in light of Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), section 115--10 of the Code (725 ILCS 5/115--10 (West 2002)) is unconstitutional, such that the trial court erred in allowing the jury to consider testimony pursuant to that section of the Code. In making this argument, the defendant relies on In re E.H., 355 Ill. App. 3d 564, 576 (2005), vacated 224 Ill. 2d 172, 181-82 (2006).

We considered and rejected an identical argument in People v. Johnson, 363 Ill. App. 3d 1060, 1071 (2005). In that case, we explained:

"The defendant's third contention on appeal is that he is entitled to a new trial due to the unconstitutionality of section 115--10 of the Code. The defendant relies on In re E.H., *** in which one panel of the Illinois Appellate Court, First District, relying on Crawford, *** determined that section 115--10 is unconstitutional. In Crawford, the Supreme Court held that testimonial forms of hearsay evidence are inadmissible absent a finding of unavailability and an opportunity to cross-examine the witnesses. Crawford, 541 U.S. at 53-54, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365-66. However, when 'the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements.' Crawford, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9. In other words, when a child sex abuse victim appears at trial and is subject to cross-examination, any prior statement of the victim being offered pursuant to

section 115--10 of the Code is a nonevent. People v. Sharp, 355 Ill. App. 3d 786, 796 (2005).

Here, the victim testified at trial and was subject to cross-examination. As such, none of the statements admitted pursuant to section 115--10 were improper under Crawford. See Sharp, 355 Ill. App. 3d at 796. Accordingly, as to the constitutionality of section 115--10 in light of Crawford, we need not address that issue here because Crawford clearly does not apply to the facts of the instant case. See People v. Nash, 173 Ill. 2d 423, 432 (1996) (reviewing court should not reach constitutional issues if the case can be determined on other grounds)." Johnson, 363 Ill. App. 3d at 1071.

Despite the defendant's implicit invitation to reconsider our decision in Johnson, we decline to do so. Because Ariana testified in this case, none of the statements that were admitted pursuant to section 115--10 were improper under Crawford.

C. Admission of Testimony About the Child-Sexual-Abuse-Accommodation Syndrome

1. Admission of testimony without a Frye hearing

The defendant argues that the trial court erred in refusing to conduct a Frye hearing on the admissibility of evidence regarding the syndrome. The defendant contends that the trial court erred in relying solely on prior Illinois decisions in admitting such evidence, because none of those decisions relied on a Frye hearing.

In Illinois, scientific evidence is admissible at trial only if meets the Frye test. People v. McKown, 226 Ill. 2d 245, 254 (2007). The Frye test is derived from Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), which held scientific testimony is admissible only if the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general

acceptance in its particular field. A court may determine the general acceptance of a scientific principle either by holding a Frye hearing or by taking judicial notice of "unequivocal and undisputed prior judicial decisions or technical writings" on the subject. McKown, 226 Ill. 2d at 254. It is well recognized, however, that relying exclusively upon prior judicial decisions to establish general scientific acceptance can be a "hollow ritual" if the underlying issue of scientific acceptance has not been adequately litigated. See In re Commitment of Simons, 213 Ill. 2d 523, 537 (2004). At issue here is whether it was proper for the trial court to forgo a Frye hearing and determine the general acceptance of the syndrome theory by taking judicial notice of prior decisions. Our review is de novo. Simons, 213 Ill. 2d at 531.

Based on prior decisions, the trial court was not required to conduct a Frye hearing. In particular, in People v. Nelson, 203 Ill. App. 3d 1038, 1040-45 (1990), the appellate court conducted a comprehensive analysis on the admissibility of evidence regarding the syndrome. Although the Nelson court did not specifically reference Frye in its decision, it conducted an analysis similar to what Frye requires. Under the Frye standard, the trial court is not asked to determine the validity of a particular scientific technique. Simons, 213 Ill. 2d at 532. Rather, the court's responsibility is to determine the existence, or nonexistence, of a general consensus in the relevant scientific community regarding the reliability of that technique. Simons, 213 Ill. 2d at 532. Further, because the focus under a Frye test is primarily on counting scientists' votes, rather than on verifying the soundness of a scientific conclusion, a reviewing court can conduct a Frye hearing as well as the trial court. See Simons, 213 Ill. 2d at 532.

In Nelson, after the court considered numerous scholarly articles on the syndrome, it concluded:

"What is certain, however, is that children who have been sexually abused behave differently from children who have not been abused. Explaining such differences is the critical element, not what label may be selected to aid in the explanations." Nelson, 203 Ill. App. 3d at 1041. In other terms, the Nelson court determined that it had been generally accepted in the psychological community that children who have been sexually abused behave differently than those who have not been abused. This is exactly the underlying basis of the syndrome. Thus, as the Nelson court had determined that evidence pertaining to the syndrome was generally accepted, the trial court was not required to conduct its own Frye analysis herein. See McKown, 226 Ill. 2d at 254.

## 2. Ann Young's testimony

The defendant next complains that Ann Young was not qualified to testify as an expert as to the syndrome. The defendant argues that Young was not a psychologist and did not have any training related to the syndrome. Further, as Young never interviewed Ariana, the defendant contends that Young had no in-depth knowledge of Ariana or her actions to make a diagnosis that Ariana's behavior was consistent with the syndrome. The defendant additionally argues that Young was not an impartial observer, because she worked on behalf of sexually abused children.

The indicia of expertise are not measured by a given level of academic qualifications, but by whether the proposed expert has knowledge and experience beyond the average citizen that would assist the jury in evaluating the evidence. People v. Douglas, 183 Ill. App. 3d 241, 254 (1989). It does not matter whether the expert acquired specialized knowledge through education, training, experience, or a combination of each. People v. Pollard, 225 Ill. App. 3d 970, 976 (1992). The adequacy of an expert witness's qualifications is a matter within the sound discretion of the trial court

that will not be disturbed on review absent an abuse of discretion. People v. Petitt, 245 Ill. App. 3d 132, 145 (1993).

The trial court did not abuse its discretion in allowing Young to testify as an expert witness regarding the syndrome. The evidence at trial established that, through her experience, Young had obtained knowledge greater than the average citizen regarding the syndrome. Young testified that she was a child welfare supervisor who worked with staff members who worked with sexually abused children. She had a bachelor's degree in law enforcement, and a master's degree in human and family resources, and she was studying for a doctorate in education. She had previously been a sexual abuse therapist for 6½ years, working with victims and offenders. She was also a child care worker and dealt with emotionally disturbed, abused, and neglected adolescents. She testified that she was familiar with the syndrome through reading articles on the subject and her work with children.

Despite the defendant's protests to the contrary, Young did not need to be a psychologist or an expert in the field of psychology to testify as to the syndrome. See Petitt, 245 Ill. App. 3d at 145-146 (explaining that although prior version of section 115--7.2 (Ill. Rev. Stat. 1987, ch. 38, par. 115--7.2) allowed only behavioral psychologists, psychiatrists, or physicians to be qualified as experts to testify in the area of post-traumatic-stress syndrome following sexual abuse, amended version of statute expanded field of persons to testify in that area). Moreover, because Young testified only generally as to how children act when they are sexually abused and how offenders act when they sexually abuse children, there was no need for her to have personally examined Ariana. Further, as to any alleged bias that Young had against the defendant because of her work on the behalf of sexually abused children, defense counsel was free to bring this out in his cross-examination of Young or in closing arguments. Young's profession was not a basis to disqualify her from testifying.

3. Relevance of the syndrome

The defendant contends that the testimony regarding the syndrome should have been excluded because it was not relevant. Specifically, the defendant argues that Ann Young's testimony regarding the syndrome should have been excluded because (1) there was no evidence that Ariana was suffering from a post-traumatic-stress disorder; (2) the syndrome applies only to a child who has a close relationship with an abuser, such as a parent, and where the abuse occurs over an extended period of time; (3) Ariana did not demonstrate any of the symptoms of the syndrome other than she kept the alleged abuse secret; and (4) evidence regarding the syndrome was intended to be used in rebuttal to rehabilitate a witness, not in the State's case-in-chief.

Evidence is admissible when it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. People v. Gonzalez, 142 Ill. 2d 481, 487 (1991). Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence. People v. Morgan, 197 Ill. 2d 404, 455-56 (2001). It is within the trial court's discretion to determine whether evidence is relevant and admissible, and the trial court's decision on the issue will not be reversed absent an abuse of discretion. Morgan, 197 Ill. 2d at 455. A trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. Morgan, 197 Ill. 2d at 455.

We do not believe that the trial court abused its discretion in allowing Young to testify regarding the syndrome. As explained by the court in Nelson, such expert testimony is relevant because "[f]ew jurors have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship." Nelson, 203 Ill. App. 3d at 1042. Further, "the behavior exhibited

by sexually abused children is often contrary to what most adults would expect." Nelson, 203 Ill. App. 3d at 1042.

We additionally note that the admission of evidence pertaining to the syndrome is specifically authorized by section 115--7.2 of the Code (725 ILCS 5/115--7.2 (West 2008)). That section provides:

"In a prosecution for an illegal sexual act perpetrated upon a victim, including but not limited to prosecutions for violations of Sections 12--13 through 12--16 of the Criminal Code of 1961, *** testimony by an expert, qualified by the court relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence." 725 ILCS 5/115--7.2 (West 2008).

The Nelson court explained that the legislative intent underlying section 115--7.2 was "to grant the trial court broad discretion in the admission of evidence of post-traumatic syndromes from a qualified source." Nelson, 203 Ill. App. 3d at 1046. While acknowledging that the syndrome was not listed in the Diagnostic and Statistical Manual of Mental Health III (DSM-III), the Nelson court found the discretion the legislature gave to the trial court through section 115--7.2 was broad enough to include syndrome-related testimony under the general label of post-traumatic-stress syndrome. Nelson, 203 Ill. App. 3d at 1042, 1046.

In finding that the trial court did not abuse its discretion in admitting Young's testimony, we note that Young's explanation of the syndrome was different from that of Dr. Summit, who originally proposed the theory of the syndrome. For example, Young testified that an abuser could use implied intimidation in order to maintain a victim's secrecy. In his article, Dr. Summit used examples of only explicit intimidation. Young also testified that the syndrome could apply to a babysitter-child

relationship whereas Dr. Summit's article described the syndrome as resulting from the actions of a father-figure to the child. We note that the discrepancies between Young's testimony and Dr. Summit's article were brought to the jury's attention by defense counsel during his cross-examination of Young. Thus, we believe that the discrepancies went to the weight of Young's testimony, not its admissibility.

Further, although the Nelson court did indicate that testimony regarding the syndrome should be limited to rebuttal (Nelson, 203 Ill. App. 3d at 1045), that part of its holding has since been modified. See People v. Dempsey, 242 Ill. App. 3d 568, 589 (1993) (explaining that State may present evidence of syndrome in its case-in-chief where the defendant, through cross-examination of the State's witnesses, has attacked the victim's credibility by introducing evidence of delayed reporting or inconsistencies in her testimony). Here, as defense counsel attacked Ariana's credibility during cross-examination by bringing to the jury's attention her delayed reporting and inconsistencies in her testimony, the trial court properly allowed Young to testify as to the syndrome. See Dempsey, 242 Ill. App. 3d at 589.

We additionally find the defendant's reliance on People v. Simpkins, 297 Ill. App. 3d 668 (1998), to be misplaced. In Simpkins, the child victim recanted her statements the defendant sexually abused her. The State elicited testimony from a DCFS investigator that established the victim had told the investigator of the abuse. The trial court then, over objection, permitted the investigator to testify "in his experience, recantation occurs in 50% of the cases." Simpkins, 297 Ill. App. 3d at 674. The investigator then testified that causes of recantation include blame from family members. Simpkins, 297 Ill. App. 3d at 674-75.

The reviewing court found the trial court erred by permitting the investigator's testimony regarding recantation. The court first held the testimony did not assist the jury in reaching its verdict, given that no evidence was presented to show the victim recanted because she felt blame from her family. Simpkins, 297 Ill. App. 3d at 682-83. The court further held the testimony constituted improper commentary on the victim's credibility. Simpkins, 297 Ill. App. 3d at 683.

Here, unlike in Simpkins, the expert testimony found support in the testimony of the laywitnesses. Ariana acknowledged that she did not tell anyone about the abuse until two years after it occurred. She also testified that the abuse occurred on multiple occasions. We also note that Young never commented on Arianna's credibility.

Overall, we believe that Young's testimony could have aided the trier of fact. We also do not believe that her testimony impinged upon the jury's determination of Ariana's credibility. Simpkins, therefore, did not bar the expert's testimony in this case.

4. Introduction of syndrome-related evidence deprived the defendant of a fair trial

The defendant contends that the trial court deprived him of a fair trial by allowing Young's testimony. The defendant argues that, although Young did not explicitly testify that she believed Ariana had been sexually abused, in order to testify that Ariana exhibited signs of the syndrome, she necessarily had to operate from an assumption that Ariana had been abused. Therefore, the trial court's attempt to limit the testimony only to whether Ariana's behavior was consistent with the syndrome was an impossible fiction. Further, the defendant insists that his expert, Dr. Meyer, could not ameliorate the effects of Young's testimony as to the syndrome, because studies indicate that once jurors hear about it, they instantly form beliefs as to its validity.

The defendant's argument is essentially that the prejudicial effect of Young's testimony outweighed its probative value. As explained earlier, however, evidence regarding how children act after being abused is very probative. See Nelson, 203 Ill. App. 3d at 1038. We therefore cannot say that the trial court's decision to allow this evidence was arbitrary, fanciful, or unreasonable. See Morgan, 197 Ill. 2d at 455. We therefore decline to disturb the trial court's ruling on this basis.

### D. Ineffective Assistance of Counsel

The defendant argues that the trial court erred in denying his motion for a continuance to allow him to procure an expert to testify regarding the inherent unreliability of a child's memory. The defendant acknowledges that his attorney, in requesting the continuance, did not submit an offer of proof as to what the expert would testify. The defendant argues that his counsel was ineffective on these grounds and therefore he should still be afforded relief.

At a hearing on August 20, 2008, defense counsel requested a Frye hearing as to evidence pertaining to the syndrome. Relying on People v. Cardamone, 381 Ill. App. 3d 462 (2008), defense counsel also requested to be allowed to present expert testimony about how children can have their memories molded or distorted. The trial court denied the defendant's request for a Frye hearing but indicated that the defendant would be allowed to have his own expert testify to try to discredit the State's evidence regarding the syndrome. As to defense counsel's request to have an additional expert testify as to the unreliability of children's memories, the trial court stated:

"But your argument doesn't fly now if you want some other theory and this case has been out three years and you want to start coming up with other theories and you want the Court to pay for a fishing expedition about susceptibility and not really to this.

Then I think you're weak in that, saying after three years now we're getting to trial now you want to start talking to experts about doing a fishing expedition to see what we can come up with a defense. I think you're a little late on that."

As the defendant acknowledges, defense counsel did not submit an offer of proof as to what his additional expert would have testified to. Absent an offer of proof, we will not disturb the trial court's ruling. See Clayton v. County of Cook, 346 Ill. App. 3d 367, 385 (2003) (failure to make an offer of proof results in forfeiture of review of whether the evidence was excluded improperly); People v. Kraft, 277 Ill. App. 3d 221, 225-26 (1995) (when trial court refuses to allow introduction of evidence, no appealable issue remains unless a formal offer of proof is made).

The defendant insists that we may nonetheless consider the issue on the basis that his counsel was ineffective for failing to submit an offer of proof. However, as there is no indication in the record what the offer of proof would have been, we cannot find defense counsel ineffective on this basis. See People v. Bauer, 393 Ill. App. 3d 414, 424 (2009) (where no offer of proof was part of record, reviewing court would not speculate as to what expert may have testified; thus, trial counsel could not be found ineffective due to failure to obtain expert); People v. Neylon, 327 Ill. App. 3d 300, 312 (2002) (when appellate record does not contain adequate offer of proof, the defendant's claims of ineffective assistance of counsel are better served in the context of a postconviction petition where a complete record can be made).

### E. IPI Criminal 4th No. 3.15

The defendant contends that the trial court erred in refusing to instruct the jury with IPI Criminal 4th No. 3.15 regarding the circumstances of identification. The defendant argues that his defense at trial was that he did not commit the offenses and his theory of the case included argument

that Ariana either was mistaken about the identity of her abuser or was not telling the truth. The defendant insists that both of these arguments supported an instruction to the jury regarding how it should view Ariana's inability to identify the defendant in court.

A defendant is entitled to an instruction on his theory of the case if there is "some" evidence in the record to support it. People v. Mohr, 228 Ill. 2d 53, 65 (2008). Very slight evidence on the theory of defense will justify giving an instruction. People v. Uptain, 352 Ill. App. 3d 643, 646 (2004). On review, the question is whether the instructions, considered as a whole, fully and fairly announce the law applicable to the theories of the parties. Mohr, 228 Ill. 2d at 65. Although instruction of the jury generally rests within the discretion of the trial court, whether the defendant introduced sufficient evidence to obtain an instruction on his theory of the case is a question of law that is reviewed de novo. People v. Dunlap, 315 Ill. App. 3d 1017, 1024 (2000).

IPI Criminal 4th No. 3.15 provides:

"3.15 Circumstances of Identification

When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[or]

[2] The witness's degree of attention at the time of the offense.

[or]

[3] The witness's earlier description of the offender.

[or]

[4] The level of certainty shown by the witness when confronting the defendant.

-27-

[or]

[5] The length of time between the offense and the identification confrontation"

The Committee Note indicated the instruction simply listed factors well established by the cases of Manson v. Brathwaite, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977), People v. Slim, 127 Ill. 2d 302 (1989), and People v. Manion, 67 Ill. 2d 564 (1977). In those cases, at issue was the victims' ability to identify the persons who had sold them heroin or had robbed them. Manson, 432 U.S. at 101, 53 L. Ed. 2d at 145, 97 S. Ct. at 2246; Slim, 127 Ill. 2d at 305-06; Manion, 67 Ill. 2d at 568-69. The victims did not have any interaction with the drug sellers or robbers other than when they bought drugs or were robbed. Manson, 432 U.S. at 101, 53 L. Ed. 2d at 145-46, 97 S. Ct. at 2246; Slim, 127 Ill. 2d at 305-06; Manion, 67 Ill. 2d at 568-69. Those cases are not comparable to the case at bar. Here, although Ariana did not identify the defendant in court, she testified that she was abused by "Frank" while he babysat her. Ariana's mother identified the defendant in court and testified that he had babysat Ariana for a three-month period. Ariana's mother also testified that no one named "Frank," other than the defendant, had ever babysat Ariana. Further, Arianna's mother testified that she had never heard Ariana talk about anyone named "Frank" other than the defendant. Additionally, the defendant acknowledged that he had babysat Ariana. As such, the defendant's identity as the alleged abuser was not really at issue. Thus, the trial court did not err in not giving IPI Criminal 4th No. 3.15. See Dunlap, 315 Ill. App. 3d at 1024.

### F. Cumulative Error

The defendant next contends that the cumulative errors in this case deprived him of a fair trial. However, as we have determined that the defendant's prior contentions of error are without merit, then his last contention necessarily fails as well. People v. Bauer, 393 Ill. App. 3d 415, 430 (2009)

(where there is no reversible error on any individual issue, these issues cannot cumulatively warrant a new trial).

## IV. Imposition of Crime Stoppers Fine

The defendant's final contention on appeal is that the trial court lacked authority to order him to pay $100 to Crime Stoppers. The State concedes error, and we accept the State's concession. Sections 5--6--3(b)(12) and 5--6--3.1(c)(12) of the Unified Code of Corrections provide for the imposition of fines for the purpose of reimbursing local anticrime programs (730 ILCS 5/5--6--3(b)(12), 5--6--3.1(c)(12) (West 2008)). However, those provisions define possible conditions of probation, conditional discharge, and supervision. No similar provisions authorize imposition of such a fine when a sentence of incarceration is imposed. See 730 ILCS 5/5--9--1, 5--9--1.1, 5--9--1.4 (West 2008). Accordingly, we vacate that part of the trial court's sentencing order imposing the $100 fine for Crime Stoppers. See People v. Beler, 327 Ill. App. 3d 829, 837 (2002).

## V. Conclusion

For the foregoing reasons, we vacate the defendant's fine for Crime Stoppers. In all other respects, the judgment of the circuit court of Boone County is affirmed.

Affirmed in part and vacated in part.

BURKE, J., concurs.

JUSTICE McLAREN, specially concurring:

I specially concur because I have a concern regarding the relevance and admissibility of the alleged syndrome postulated by Dr. Summit. If Dr. Meyer is to be believed, this is neither an accredited syndrome nor a scientific tool to aid the trier of fact. Rather, it is a tool to aid the

counselor in rehabilitating the victim. If the trial court had determined that Dr. Meyer's testimony was credible and preponderant, or that Dr. Summit did not believe his postulated syndrome was formulated to be utilized by courts, then I believe it would have been an abuse of discretion to admit evidence of this syndrome. Giving deference to the court's assessment of credibility, I do not believe the record establishes that evidence of the syndrome was inadmissible. However, there may come a day when a court determines that the weight of the evidence regarding relevance and admissibility will result in a denial of this alleged syndrome as a legal tool and an affirmation that it is solely a counseling tool.